[Cite as *In re J.R.*, 2023-Ohio-2145.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: J.R. | : | APPEAL NO. C-220579 |
| | | TRIAL NO. F20-0442Z |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 28, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Silvia Beck*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Christopher Bazeley,* for Appellant Mother,

*Kathleen Kenney*, Attorney for the Guardian Ad Litem for J.R.

**BOCK, Judge.**

**{¶1}** Appellant mother ("mother") appeals the Hamilton County Juvenile Court's judgment awarding legal custody of her daughter, J.R., to J.R.'s maternal great-grandmother ("K.H."). We affirm the juvenile court's judgment.

## I. Relevant Facts and Procedural History

**{¶2}** J.R. was born in March 2019 at 24-weeks' gestation and hospitalized in the neonatal intensive care unit. She transferred to the "Transitional Care Center" at the Cincinnati Children's Hospital and Medical Center ("CCHMC") until her discharge in March 2020. J.R. had underdeveloped lungs, which required her to have a tracheotomy, ventilator, g-tube, and 24-hour care.

**{¶3}** At the time of J.R.'s discharge, CCHMC reported that mother had not successfully completed the requisite 12-hour training session, which required a caregiver to provide care without nursing assistance, due to mother "routinely" being "combative with hospital staff," her "refus[al] to feed [J.R.] at the designated hour," and "threat[s] to leave with the child against medical advice." CCHMC staff recommended that mother feed J.R. every three hours, but mother stated that she would feed J.R. every four hours because the nurses "were not going to regulate her baby" and she would "argue with any and everybody if they talk to her like [J.R.] is their child."

**{¶4}** Meanwhile, CCHMC staff successfully trained K.H. to provide the required care. The staff agreed to release J.R. to mother "on the condition that [J.R. and mother] live with [K.H.] and allow nursing staff to assist in care 24 hours a day."

**{¶5}** Approximately one month after CCHMC discharged J.R., the Hamilton County Department of Job and Family Services ("JFS") received a report that mother

2

"often [left] the child alone with the in-home nursing staff both day and night," "continues to leave the majority of the care to the nursing staff," and "often smokes marijuana and does not wake up to care for the child."

{¶6} In April 2020, JFS was informed that mother had left K.H.'s home with J.R., taking J.R.'s ventilator but not the charger. This was alarming because the ventilator had to be charged every six hours to ensure proper operation. JFS and law enforcement initially could not locate J.R. at various addresses, including K.H.'s home, because no one would answer the door. They eventually located mother and J.R. at J.R.'s maternal grandmother's ("grandmother") home.

{¶7} Once authorities located mother and J.R., mother and grandmother initially refused JFS's request to take J.R. to CCHMC, but they eventually agreed. Law enforcement followed them to the hospital. CCHMC staff reported to JFS that mother "became combative with hospital staff, which impeded the ability to provide the child medical care." CCHMC security removed mother from the premises in handcuffs.

<u>The juvenile court granted interim custody of J.R. to JFS</u>

{¶8} JFS became involved with the family due to its concerns with mother's ability to meet J.R.'s medical and mental-health needs, and mother's removing J.R. from K.H.'s home without the appropriate medical equipment. Moreover, the agency was concerned when it was not able to locate J.R.

{¶9} In April 2020, a Hamilton County Juvenile Court magistrate granted JFS's ex-parte emergency-custody motion and subsequent motion for interim custody of J.R. JFS's custody complaint alleged that J.R. was neglected under R.C. 2151.03 as she (1) "lack[ed] adequate parental care because of the faults or habits of [her] parents," (2) her parents "neglect[ed] or refuse[d] to provide proper or necessary

3

subsistence, education, medical, or surgical care or treatment, or other care necessary for [her] health, morals, or well-being," and her parents' "omission cause[d] the child to suffer physical or mental injury that harm[ed] or threaten[ed] to harm [her] health or welfare." The complaint further alleged that J.R. was dependent under R.C. 2151.04 as she "lacked adequate parental care by reason of the mental or physical condition" of her parents and J.R.'s "condition or environment is such as to warrant the state, in the interests of the child in assuming her guardianship."

{¶10} In May 2020, during a tracheotomy change, J.R. went into cardiac arrest. J.R. was admitted to CCHMC "for the foreseeable future." She was discharged in July 2020.

{¶11} JFS's initial case plan in June 2020 reported that (1) J.R. was in "impending danger" as mother was "unwilling or unable to meet the child's immediate and serious physical or mental health needs," (2) mother was "out of control" as she moved J.R. out of the home where the only approved caregiver, K.H., resided, and where J.R.'s medical equipment and nursing care were set up, (3) mother was not aligned with J.R.'s medical needs or following the medical team's recommendations in providing care for J.R., (4) the situation was severe as J.R. was unable to audibly cry due to the tracheotomy, was blind, and could not advocate for herself, and (5) the threat of mother's "unpredictable" moods and "anger outbursts" was imminent and could "have a severe effect on [J.R.] if proactive measures were not taken."

{¶12} The case plan required mother to (1) avoid illegal substances that impaired her parenting abilities; (2) cooperate with hospital and in-home nursing staff to care for J.R.; (3) complete random urine screens because caseworkers had smelled marijuana on mother during J.R.'s removal—usage which caused mother to sleep

4

heavily; and (4) stay current on J.R.'s medical care and comply with medical recommendations. The plan required J.R. to remain in K.H.'s home and provided for mother's supervised visits there.

{¶13} Mother disagreed with the June 2020 case plan and reported that she would not complete the services.

### The juvenile court granted JFS's request to place J.R. at St. Joe's

{¶14} In July 2020, JFS updated the case plan because J.R. was ready to be discharged from CCHMC, but "mother has refused to meet/engage in the [discharge] process as the only option she states is discharge [to her] home."

{¶15} The magistrate held a hearing on JFS's proposed placement to St. Joseph Home of Cincinnati ("St. Joe's") in October 2020. J.R.'s medical team sought a long-term care facility, rather than discharging J.R. to mother's home. J.R. had not voluntarily moved since her cardiac arrest, was in a terminal condition, and was not expected to improve. The magistrate acknowledged that mother loved J.R., had engaged in care conferences consistently over the summer, had been trained in providing care for J.R., and testified that she had family, including K.H., and friends who were willing to help with the child's care.

{¶16} The magistrate approved and incorporated the July 2020 case plan, which placed J.R. at St. Joe's. Mother was to contact St. Joe's to set up weekly supervised visits.

### The magistrate adjudicated J.R dependent

{¶17} In February 2021, the magistrate adjudicated J.R. dependent and dismissed allegations of neglect. The magistrate based his findings on J.R. not being released to mother upon her CCHMC discharge due to "(1) mother's disposition, (2)

5

her interaction with hospital staff, and (3) the potential impact of mother's recalcitrance toward certain professionals [] on the quality of the child's care." The magistrate subsequently granted JFS temporary custody of J.R.

{¶18} In early 2021, mother would not give consent for surgery to assess J.R.'s lung function. As such, J.R.'s procedure had to be rescheduled while JFS awaited the court's approval of the surgery.

{¶19} An April 2021 semi-annual report ("SAR") stated that Mother continued to refuse to sign any releases of information for JFS, the caseworker had not been able to meet with her, and visitation was the only case-plan service in which mother participated. Mother was working better with St. Joe's staff, though she continued "to be more concerned with exerting control over [J.R.'s] care." The SAR also reported that a social media video showed mother "smoking some substance" and that the guardian ad litem reported concerns that mother was "abusing substances." Although reunification remained the goal, mother had not made sufficient progress with the case plan.

{¶20} Then in June 2021, JFS submitted a case plan showing that the social media video of mother smoking marijuana also captured her "talking openly" about ending her and J.R.'s lives, and that mother "smokes and drinks when she is mad." Further, it reported that in JFS's interactions with mother, she had been angry and combative, even in the courthouse. Although case plans continued to set expectations for mother, she did not meet those expectations. She refused to discuss J.R.'s case plan, failed to engage with JFS or J.R.'s caregivers, and stopped visiting J.R. after a re-admission to CCHMC in July 2021.

6

{¶21} In December 2021, JFS moved to terminate its temporary custody and award custody of J.R. to K.H.

<u>Mother's interaction with J.R.'s caregivers at St. Joe's</u>

{¶22} St. Joe's had been providing 24-hour direct nursing and direct day-to-day care for J.R. since November 2020. J.R. required 24-hour medical care because she was ventilator-dependent, and had a tracheotomy and a feeding tube. J.R. did "not have much purposeful movement at all," was unable to interact verbally or with facial expressions, had not made any improvements since her admission to St. Joe's, and was expected to remain in this condition for the rest of her life.

{¶23} Dominique Weaver, a program service manager with St. Joe's, coordinated the visits and day-to-day logistics for J.R. Weaver testified at the January 2022 hearing that family members could visit without the nurse if they completed training "on trach care, changing the trach emergency care. They go over the meds * * * and go over the feedings; basically, the day-to-day needs that [the] resident needs." Once the training is complete, the parent must do a "test-out" where the parent stays "in a cottage with the loved one" for 24 hours and provides all the care during that time, along with a second caregiver. The parent must have a second caregiver at the discharge training before the resident is discharged.

{¶24} Weaver recalled that mother attended a "person centered planning"—an annual meeting of all the caregivers to review the resident's care for the previous year. The meeting was "a little tense" and "voices kind of got raised" because mother and grandmother wanted to discuss discharging J.R., but that meeting was not intended to discuss discharge. Mother and grandmother left the meeting. Mother told St. Joe's that "the Court said [she] can take [J.R.] home, [she was] taking [J.R.] home,"

7

and she submitted paperwork to have J.R. discharged. But St. Joe's did not release J.R. because JFS provided documents to show that it had temporary custody of J.R.

{¶25} During Weaver's last conversation with mother, Weaver informed her that JFS requested that her caregiver training be put on hold until mother spoke with JFS because mother had been refusing to have contact with JFS. Weaver testified that mother "kind of got loud" and said that she did not want to contact JFS, and she did not have to call JFS because they had "nothing to do with discharge." Weaver informed mother that visitation could continue.

{¶26} Mother eventually completed her caregiver training, but she did not complete the 24-hour training required before a resident's discharge.

Mother and JFS provide testimony about her participation in case plans

{¶27} Marsheila Caldwell, a JFS caseworker, had developed the initial June 2020 case plan seeking to reunify J.R. with mother. She attempted to reach mother via phone and email "to try to set up a home visit to discuss case plans, requirements, as well as get a signed release [of information]." Caldwell scheduled two home visits between September 2021 and December 2021, but neither happened. Mother cancelled one. JFS cancelled the other visit because of the belief that it was not safe for the caseworkers to go into the home due to "aggression, * * * loudness, the yelling, the threatening that [Caldwell] better be on time" from mother and grandmother. JFS sent emails to mother to request dates to reschedule the visit for January 2022, but mother never responded.

{¶28} Caldwell testified that JFS wanted mother and grandmother to engage in services because J.R. would live with grandmother and mother. They were supposed to sign a release of information ("ROI"), complete a diagnostic assessment ("DAF") to

determine what, if any, services should be recommended, and submit to random drug screenings. JFS never sent mother to engage in services because mother never signed a ROI and refused to meet with JFS. Caldwell explained that the DAF could have addressed mother's "out-of-control behaviors, the outbursts," such as banging on the door, using profanity, and throwing things out of J.R.'s chair during a visit.

{¶29} At the custody hearing, mother testified that she did not sign the ROI because she was not "about to inconvenience [her] life for [JFS]." Mother asserted that she misunderstood that the person being drug tested must sign a ROI for JFS to obtain the results. The court asked mother if JFS ever explained that she had to sign the ROI, and mother responded, "No. Nobody never responded."

<u>Mother and others testified about visitation</u>

{¶30} At the time of the January 2022 hearing, K.H., who had completed her caregiver training, had been visiting J.R. twice a week since August 23, 2021, except for December 2021, and had been the only consistent visitor since September 2021.

{¶31} Weaver confirmed that loved ones were permitted to have face-to-face visits during COVID upon request. Mother could have obtained additional visitation time had she requested it. Weaver had not received any visit requests from mother since the end of summer 2021. At the time of this hearing, mother had not contacted or visited J.R. in the previous 90 days, nor had she reached out to find out how J.R. was doing.

{¶32} Mother testified that she saw J.R. at St. Joe's twice a week after J.R. was admitted in November 2020, and about three or four times between September and November 2020 "before somebody caught COVID and they shut down" and she had to "go without seeing" J.R.

9

{¶33} But Weaver testified that the last time mother had visited J.R. at St. Joe's was "sometime in September" 2021, for a caregiver training. She testified that before that, mother had not visited J.R. since "toward[] the summer of 2021."

{¶34} When initially asked why she was not visiting J.R., mother responded, "I didn't know I needed to explain that. I didn't know I needed a reason." This was followed by, "She's coming home. So * * * I went back to my life. I have bills to pay so I kept working. That wasn't a big issue to me because I know where she was going * * *." Mother testified during the March 2022 custody hearing that she had resumed visits, and since her January 2022 visit, she had been to five out of six visits, but had missed the last one because she was sick. Later, mother testified that she recently had not visited J.R. for two weeks due to needing to have her vehicle repaired, and that she would be using either her mother's or brother's vehicle until hers was repaired.

{¶35} Caldwell testified that if K.H. were awarded custody, J.R. would remain at St. Joe's where she, mother, and others could continue to visit her. She testified that, at that time, J.R. was about two-and-a-half years old. She was not sure if mother was bonded to J.R. due to the lack of visits.

<u>Mother denied marijuana use</u>

{¶36} Melissa Rogers, director of nursing at St. Joe's, testified that one of the nurses overseeing a March 2021 visit reported that mother smelled of marijuana. Mother explained that she had been around people who had been smoking marijuana before the visit, that this had happened before, and that she would spray her clothes before visiting with J.R. so that J.R. would not smell it. A nurse reminded mother that she must be mindful of sprays and scents on her clothes because of the effect that it could have on J.R.'s respiratory system.

10

{¶37} At the custody hearing, mother asserted that the marijuana smell came from her grandfather, who has a medical-marijuana card. She said, "I guess they assume, since there's a case going on with me, they know I smoke, they assumed it was me." Mother stated that JFS did not address this issue until the next visit, and she was not going to "tell on" her grandfather.

{¶38} Mother did not refute that she had been using marijuana in a social media video. Instead, she asserted that she no longer used marijuana. She stated that her job had screened her for drugs, she did not have her work drug screen results with her, but "it wouldn't be hard to ask [her] job for a copy."

{¶39} Mother said that, although she had previously agreed to take a drug test, she would not take one at that time because JFS should have drug tested her the previous year when she had provided JFS permission to drug test her. "And nobody did nothing about it. Nobody never brought it up again." Mother asserted that she had requested a drug-screen appointment, but she never got a response.

Mother disagreed with JFS's testimony about her engagement in case-plan services

{¶40} Mother conceded that she initially did not work with JFS because "the first person" was rude and was "popping up" at her house. Mother did not believe that the random visits were necessary as JFS could call in advance.

{¶41} But mother contested the caseworker's testimony that mother could not be reached, testifying that she had repeatedly asked the caseworker to call her instead of emailing her, as she has "over 64,000 emails" in her inbox.

{¶42} Mother explained why JFS could not find J.R. on the day she reportedly abruptly moved J.R. from K.H.'s home. Mother said that she had been on a walk with

J.R. and K.H. had cut off mother's phone service. Further, she said she had all the equipment and medications that J.R. needed.

{¶43} When opposing counsel asked mother whether it was fair to say that she was not engaged with J.R.'s treatment team, mother agreed that she was not engaged.

{¶44} Mother testified that grandmother's home, where mother planned to live with J.R., had furniture, medical equipment, and necessary supplies for J.R. She stated that she had spoken with her employer about changing her schedule "to take a day or two away from [her] normal schedule," but that grandmother's nursing agency was available as additional support.

{¶45} Mother denied that it was important for her to discuss with St. Joe's the treatment plan if J.R. were to live with her. Mother denied ever being disruptive during visits, adding that she "ha[d] no idea" from where JFS got that idea.

<u>The magistrate and trial court came to different conclusions</u>

{¶46} The magistrate determined that custody should be remanded to mother, finding that mother loves J.R., had engaged in care, and had been trained in providing care for J.R.

{¶47} But the juvenile court disagreed. It noted J.R.'s permanent vegetative state and need for 24-hour care. It considered the fact that mother had not visited J.R. between September 2021 and January 2022, mother did not feel like she needed to explain why she did not visit, and mother believed that J.R. was coming home so "she went back to her life." The court also considered reports of mother's marijuana usage and mother smelling of marijuana when JFS removed J.R. and during a visit at St. Joe's. The court further considered mother's refusal to sign an ROI, complete a diagnostic assessment, or submit to urine screens. It noted mother's testimony that

she "was not about to inconvenience [her] life for [JFS]," and that mother did not believe that it was necessary to communicate with J.R.'s medical team about the care plan.

{¶48} Among other factors, the court considered J.R.'s interactions and relationships under R.C. 3109.04(F)(1)(c). First, while grandmother had testified to the steps that she took to ensure that she could properly care for J.R., granting custody to grandmother was not an option before the court. Second, mother's testimony did not show insight into J.R.'s needs and concerns with the child's care, noting that, even if mother's testimony as to why she smelled of marijuana during a visit and that she usually sprays her clothes down after being exposed to the smell were true, the fact that she had to be reminded that strong smells can have an adverse effect on J.R.'s respiratory system showed a lack of insight. Third, the court reiterated concerns that mother had stopped visiting J.R. and did not know that she needed to state a reason behind it. Fourth, the court noted mother's refusal to sign the ROI so that JFS could provide her case-plan services. The court expressed concern regarding mother's behaviors and actions because they showed that mother was not dedicated to caring for J.R.

{¶49} After considering all relevant factors, the court determined that it was in J.R.'s best interest to grant legal custody to K.H. Mother appealed.

## II. Law

### A. Standard of Review

{¶50} When determining the appropriate disposition for a child adjudicated dependent, the juvenile court may "[a]ward legal custody of the child to either parent or to any person" that moves for legal custody. R.C. 2151.353(A)(3). The juvenile

13

court's award of legal custody of J.R. to K.H. vested her with certain caretaking and decision-making rights. *In re D.L.*, 1st Dist. Hamilton No. C-220448, 2023-Ohio-1125, ¶ 13; s*ee* R.C. 2151.011(B)(21). "[A]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *In re A.W.*, 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, ¶ 9.

**{¶51}** The juvenile court's decision to grant or deny legal custody "must be determined according to the best interest of the child." *Id.* at ¶ 19. Because mother retained her residual parental rights, privileges, and responsibilities, we review the juvenile court's decision for an abuse of discretion. *In re D.L.* at ¶ 14. To find that the juvenile court abused its discretion, the court's decision must be unreasonable, arbitrary, or unconscionable. *Id.* In the context of legal-custody decisions, best-interest findings are reasonable if supported by competent and credible evidence. *Id.*

### The juvenile court did not abuse its discretion

**{¶52}** Mother argues that the juvenile court's judgment awarding legal custody of J.R. to K.H. is not supported by the evidence.

**{¶53}** We have no reason to doubt the magistrate's finding that mother loves J.R. But we agree with the juvenile court that granting custody of J.R. to K.H. is in J.R.'s best interest.

**{¶54}** The juvenile court's factual findings are based on a plethora of credible evidence. JFS's complaint alleged that mother left J.R.'s care to the nurses and smoked marijuana to the point of being unable to wake up and care for J.R. Moreover, mother refused to submit to drug tests. The court's concern regarding mother's marijuana use is valid.

14

{¶55} The record is replete with reports of mother's outbursts, poor decisions, and refusal to communicate or cooperate with JFS and St. Joe's. She refused to follow the recommendations of J.R.'s nursing team. She failed to engage in case-plan services, other than visitation, in which she eventually stopped engaging as well. She refused to sign a ROI and therefore never engaged in services. Mother never submitted to drug screens. Mother showed no interest in working with J.R.'s medical staff and JFS.

{¶56} The fact that mother abruptly removed J.R. from the home that J.R.'s medical team approved without the equipment necessary to keep her alive shows a lack of care for J.R.'s well-being, especially because mother downplayed the incident and argued that she had what J.R. needed.

{¶57} Mother's failure to visit J.R. for months constitutes competent, credible evidence that mother did not alleviate JFS's concern that J.R. lacked adequate parental care and that her condition or environment warranted the agency's intervention. Mother's explanation that she did not feel visits were necessary because J.R. would be coming home shows a serious lack of insight into her child's needs. And Mother only began visiting J.R. again when the hearings on JFS's motion to grant custody to K.H. began. Even then, mother did not visit the child consistently.

{¶58} K.H. completed the requisite care training. And K.H. was the only family member who consistently visited J.R. JFS had no concerns about K.H.'s ability to adequately care for J.R. The juvenile court's decision to award legal custody to K.H. was not unreasonable, arbitrary, or unconscionable.

### III.    Conclusion

**{¶59}**  The juvenile court did not abuse its discretion by granting K.H. legal custody of J.R. We overrule mother's sole assignment of error.

Judgment affirmed.

**BERGERON, P.J.,** and **KINSLEY, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.